# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                          No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill";
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and Brandy Rodriguez,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Sealed Motion Regarding

Attorney Conflict, filed May, 4, 2017 (Doc. 1126)("Attorney Conflict Motion"). The Court held hearings on November 8-9, 2017, Transcript of Hearing (held November 8, 2017), filed November 20, 2017 (Doc. 1456)("Nov. 8 Tr."); Transcript of Hearing (held November 9, 2017), filed November 20, 2017 (Doc. 1457)("Nov. 9 Tr."), and again on November 27-29, 2017, Draft Transcript of Motion Hearing (taken November 27-29, 2017)("Second Hearing Tr.").[1] The primary issue is whether Michael V. Davis' ethical duties to his former client, Defendant Roy Paul Martinez, prevent Mr. Davis from representing Defendant Carlos Herrera in this case. The Court determines that Mr. Davis' represented R.P. Martinez in a matter that is substantially related to this case and that R.P. Martinez' interests are materially adverse to Herrera's. Accordingly, the Court concludes that Mr. Davis' ethical duties to R.P. Martinez prevent him from representing Herrera in this matter.

## FACTUAL BACKGROUND

Before setting out its findings of fact, the Court will provide background information regarding the Syndicato de Nuevo Mexico ("SNM") as well as background information regarding each of the Defendants in this case and the charges that they face. The Court takes its background facts from the Superseding Indictment, filed April 21, 2016 (Doc. 367). The facts are largely unchanged from those that the Court provided in its Memorandum Opinion and Order, filed October 28, 2016 (Doc. 753). See United States v. DeLeon, 2016 WL 7242579 (D.N.M. 2016)(Browning, J.). See also Memorandum Opinion and Order, filed March 8, 2017 (Doc. 943); United States of America v. Angel DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.). The Court does not set forth these facts as findings or the truth. The Court

---

[1] The Court's citations to the second hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

recognizes that the factual background is largely the United States' version of events and that the Defendants are all presumed innocent.

This case deals with crimes that SNM allegedly committed through its members. <u>See</u> Superseding Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Superseding Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Superseding Indictment at 3.

SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. Superseding Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. <u>See</u> Superseding Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. <u>See</u> Superseding Indictment at 3. SNM has approximately 250 members, run by "a 'panel' or 'mesa' (Spanish for table) of leaders who issued orders to subordinate gang members." Superseding Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. <u>See</u> Superseding Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. <u>See</u> Superseding Indictment at 4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing]

murder and assaults." Superseding Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. <u>See</u> Superseding Indictment at 4. If another gang does not abide by SNM's demands, SNM manages to assault or kill one of the other gang's members to show its power. <u>See</u> Superseding Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. <u>See</u> Superseding Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Superseding Indictment at 4-5. To show its strength and influence, SNM expects its members to confront and attack any suspected law-enforcement informants, cooperating witnesses, homosexuals, or sex offenders. <u>See</u> Superseding Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. <u>See</u> Superseding Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. <u>See</u> Superseding Indictment at 7. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the present investigation. <u>See</u> <u>United States v. Garcia</u>, No. 15-4275 JB, Memorandum Opinion and Order at 2, filed November 16, 2016 (Doc. 133)(citing United States' Response to Defendant's Motion to Designate Complex (Doc. 56) at 1, filed May 3, 2016 (Doc. 70)). The other relevant facts giving rise to this case are as follows.

In March of 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina, Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico state prison. <u>See</u> <u>United States v. DeLeon</u>, 2016 WL

7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See United States v. DeLeon, 2016 WL 7242579, at *3.  That grand-jury indictment charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See United States v. DeLeon, 2016 WL 7242579, at *3.  The Doña Ana County District Attorney then dismissed the charges against Montoya and Armenta -- as well as separate charges against alleged accomplice and Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy -- in November of 2015.  See United States v. DeLeon, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  United States v. DeLeon, 2016 WL 7242579, at *3.

The United States now brings this case against thirty Defendants, charging them with a total of fifteen counts.  See Superseding Indictment at 1.  All Defendants are accused of participating in the operation and management of the enterprise and committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Superseding Indictment at 6-31.  Defendants Arturo Arnulfo Garcia, Gerald Archuleta, Benjamin Clark, Mario Rodriguez, Anthony Ray Baca, Robert Martinez, R.P. Martinez, and Daniel Sanchez are the alleged enterprise leaders.  See Superseding Indictment at 6.  The other twenty Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Superseding Indictment at 6.  The SNM gang

enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1), 1961(1) define that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841, 846. Superseding Indictment at 9. In all, the Superseding Indictment alleges fifteen different counts against the various Defendants.

Specifically, the Superseding Indictment provides that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia allegedly murdered "F.C." Superseding Indictment at 9. On the same day, Defendants Lujan, B. Garcia, Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Superseding Indictment at 12. On June 17, 2007, Defendants Javier Alonso, Troup, A.A. Garcia, Clark, and Ruben Hernandez allegedly murdered "F.S." Superseding Indictment at 15. On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Superseding Indictment at 18. On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Superseding Indictment at 19. In March 2014, Defendants Jerry Armenta, Montoya, Rodriguez, Timothy Martinez, Baca, Mauricio Varela, Sanchez, Carlos Herrera, and Rudy Perez allegedly conspired to murder "J.M." Superseding Indictment at 20-21. On March 7, 2014, Defendants Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and Perez allegedly murdered J.M. See Superseding Indictment at 21.

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Superseding Indictment at 27. Starting "on a date uncertain, but no later than

2013," and until the date of the Superseding Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and Defendant Robert Martinez allegedly conspired to murder "D.S." Superseding Indictment at 28. During the same period of time, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Superseding Indictment at 28. On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Superseding Indictment at 29. On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a charge of conspiracy to murder. See Superseding Indictment at 29.

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Superseding Indictment at 30. From February 1, 2016, until February 27, 2016, J. Gallegos, and Defendants Santos Gonzalez, Paul Rivera, Shauna Gutierrez, "and others known and unknown to the grand jury," allegedly conspired to murder "J.G." Superseding Indictment at 30. The final count alleges that, on February 27, 2016, J. Gallegos, Gonzalez, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Superseding Indictment at 31.

## FINDINGS OF FACT

The Court will make explicit findings of fact, because "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record," Fed. R. Crim. P. 12(d), even though rule 12(d) of the Federal Rules of Criminal Procedure "'does not require detailed findings of facts as long as the essential basis of the court's decision is apparent,'" United States v. Burbage, 365 F.3d 1174, 1178 (10th Cir. 2004)(Hartz, J.)(quoting United States v. Toro-Pelaez, 107 F.3d 819, 824 (10th Cir. 1997)). The Court sets out the following explicit findings of fact:

1.     In 2000, Mr. Davis was appointed to represent R.P. Martinez in a New Mexico state murder prosecution.  <u>See</u> Affidavit of Michael V. Davis ¶ 5, at 2, filed May 25, 2017 (Doc. 1164-1)("Davis Aff.").

2.     "[T]here were allegations that the murder was related to SNM, [but] the existence of the SNM and Martinez' gang affiliation [were] never an essential part of the case, nor an element of the homicide charges."  Davis Aff. ¶ 6, at 2.

3.     "Martinez and others, were alleged to have strangled an inmate at BCDC [Bernalillo County Detention Center] in retaliation for some SNM information."  Davis Aff. ¶ 7, at 2.

4.     On June 24, 2002, R.P. Martinez pled guilty to second-degree murder in violation of N.M. Stat Ann. §§ 30-2-1 and 28-2.  <u>See</u> Attorney Conflict Motion at 2.

5.     "Martinez was sentenced in that case to fifteen years incarceration."  Attorney Conflict Motion at 2.

6.     On May 3, 2016, the Honorable Karen B. Molzen, United States Magistrate Judge, appointed Mr. Davis to represent Herrera.  <u>See</u> CJA Appointment, filed May 3, 2016 (Doc. 430).

7.     On September 7, 2016, Herrera asked the Court to "provide him a second chair counsel in this matter," and noted that he "is not requesting 'learned counsel' in this matter." <u>See</u> Ex Parte Motion for Second Counsel and Appointment Pro Hac Vice at 1, 3, filed September 7, 2017 (Doc. 674).

8.     The Court obliged, and appointed Carey Bhalla to represent Herrera.  <u>See</u> Ex Parte Order Approving Second Counsel and Appointment Pro Hac Vice at 1, filed September 22, 2016 (Doc. 697).

9. Count 6 and 7 of the Superseding Indictment charge Herrera -- along with Armenta, Montoya, Rodriguez, T. Martinez, Baca, Varela, Sanchez, and Perez -- with the murder of J.M. and conspiracy to commit that murder. See Superseding Indictment at 20-21.

10. R.P. Martinez and Herrera are co-defendants. See Superseding Indictment at 1.

11. Count 9 of the Superseding Indictment charges R.P. Martinez -- along with Baca and R. Martinez -- with conspiracy to murder D.S. See Superseding Indictment at 27-28.

12. Count 10 of the Superseding Indictment charges R.P. Martinez -- along with Baca, R. Martinez, and Garcia -- with conspiracy to murder G.M. See Superseding Indictment at 28.

13. R.P. Martinez and the United States entered into a Plea Agreement. See Plea Agreement at 1, filed September 15, 2016 (Doc. 686).

14. The Plea Agreement is pursuant to rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, and the United States agrees "not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment." Plea Agreement ¶ 14, at 7.

15. The Plea Agreement is also pursuant to rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and the United States and R.P. Martinez stipulate to a 2-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and that, if R.P. Martinez satisfies U.S.S.G. § 3E1.1(b)'s requirements, then the United States will move for an additional 1-level reduction for acceptance of responsibility. See Plea Agreement ¶ 9, at 5.

16. In the Plea Agreement, R.P. Martinez admits the following facts:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping,

attempted murder, and conspiracy to manufacture/distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM. On or before 2013 I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State. Baca, as the purported leader of the SNM at the Time, ordered the murders of G.M. and D.S. As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S. I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M[.] and D.S.

Plea Agreement ¶ 7, at 4.

17.     R.P. Martinez pled guilty in a hearing before the Honorable Gregory B. Wormuth, United States Magistrate Judge. <u>See</u> Plea Minute Sheet, filed September 15, 2016 (Doc. 687).

18.     The Court has not yet sentenced R.P. Martinez or accepted his Plea Agreement.

19.     The United States plans to call R.P. Martinez as a witness against Herrera. <u>See</u> Attorney Conflict Motion at 2.

20.     The United States intends to have R.P. Martinez testify regarding SNM and its racketeering activity, including the state murder prosecution where Mr. Davis represented R.P. Martinez. <u>See</u> Nov. 8 Tr. at 11:18-12:2 (Armijo, Court).

21.     The United States also intends to have another co-defendant, Gerald Archuleta, testify regarding that murder. <u>See</u> Nov. 8 Tr. at 12:17-25, 14:1-3 (Armijo).

22.     The United States predicts that R.P. Martinez will testify "that Carlos Herrera is an SNM gang member that he knows." Nov. 8 Tr. at 13:5-6 (Armijo).

23.     R.P. Martinez does not consent to Mr. Davis' representation of Herrera in this case. <u>See</u> Notice of Attorney Conflict ¶ 3, at 1, filed September 22, 2017 (Doc. 1471).

24.     Herrera wants Mr. Davis to remain as his attorney in this case notwithstanding Mr. Davis' earlier representation of R.P. Martinez.  <u>See</u> Supplemental Authority in Support of Defendant's Response to Government's Motion Regarding Attorney Conflict [Doc. 1126] at 2, filed November 22, 2017 (Doc. 1469).

## CONCLUSIONS OF LAW

Having set out its findings of fact, the Court now articulates its conclusions of law.  It begins by providing procedural background regarding this case.  The Court then states the law regarding issues relevant to the Court's analysis.  Finally, the Court conducts its analysis

## PROCEDURAL BACKGROUND

1.      As noted above, the Superseding Indictment charges Herrera with both conspiracy to murder J.M. and the murder of J.M., Counts 6 and 7, respectively.  <u>See</u> Superseding Indictment at 20-21.  Also as noted above, the Superseding Indictment charges R.P. Martinez with both conspiracy to murder D.S. and conspiracy to murder G.M., counts 9 and 10, respectively.  <u>See</u> Superseding Indictment at 27-28.  On May 3, 2016, the Honorable Karen B. Molzen, United States Magistrate Judge, appointed Mr. Davis to represent Herrera.  <u>See</u> CJA Appointment, filed May 3, 2016 (Doc. 430).  On September 7, 2016, Herrera asked the Court to "provide him a second chair counsel in this matter," and noted that he "is not requesting 'learned counsel' in this matter."  <u>See</u> Ex Parte Motion for Second Counsel and Appointment Pro Hac Vice at 1, 3, filed September 7, 2017 (Doc. 674).  The Court obliged, and appointed Carey Bhalla to represent Herrera.  <u>See</u> Ex Parte Order Approving Second Counsel and Appointment Pro Hac Vice at 1, filed September 22, 2016 (Doc. 697).

2.      On September 15, 2016, Plaintiff United States of America and R.P. Martinez filed their Plea Agreement with the Court.  <u>See</u> Plea Agreement at 8-9, filed September 15, 2016

(Doc. 686). Accordingly, R.P. Martinez pled guilty in a hearing before the Honorable Gregory B. Wormuth, United States Magistrate Judge. <u>See</u> Plea Minute Sheet, filed September 15, 2016 (Doc. 687). Conflict-of-interest issues remain, notwithstanding R.P. Martinez' guilty plea, because the United States "anticipate[s] that Martinez will be a witness in this case and his testimony will include this murder," <u>i.e.</u>, the murder for which Mr. Davis represented R.P. Martinez. Attorney Conflict Motion at 2.[2]

## 1. **<u>The Attorney Conflict Motion.</u>**

3. On May 4, 2017, the United States filed the Attorney Conflict Motion. <u>See</u> Attorney Conflict Motion at 15. The United States asserts that it has a duty to bring conflicts of interest to the Court's attention. <u>See</u> Attorney Conflict Motion at 2. The United States also asserts that the Court has a duty to investigate once it is aware of a possible conflict of interest, and a duty to determine whether to disqualify an attorney if its investigation reveals a potential or actual conflict of interest. <u>See</u> Attorney Conflict Motion at 3.

4. The United States argues that a defendant's "Sixth Amendment right to conflict-free counsel" extends beyond situations where defense counsel simultaneously represents codefendants. Attorney Conflict Motion at 4. Instead, according to the United States, that right

---

[2]That Martinez pleaded guilty means that the Court will assume, for the purposes of deciding the Attorney Conflict Motion, that Martinez will not be tried alongside Herrera. The Court is aware that it may, in its discretion, reject the Plea Agreement, <u>see</u> Fed. R. Crim. P. 11(c)(1)(A)(stating that the Court may reject a plea agreement that specifies that the government will not bring other charges); Plea Agreement at 7 ("[T]he United States agrees not to bring additional criminal charges against the defendant arising out of the facts forming the basis of the present Superseding Indictment."), and that, should the Court do so, Martinez can withdraw his guilty plea, <u>see</u> Fed. R. Crim. P. 11(d)(2)(A)(stating that a defendant may withdraw a guilty plea if the Court rejects a plea agreement that specifies that the government will not bring other charges). It is unlikely that the Court will sentence R.P. Martinez before Herrera's trial, because the United States will want R.P. Martinez to testify at that trial -- in accordance with the Plea Agreement -- before the Court sentences him, so even if the Court rejects the Plea Agreement at sentencing, Herrera's trial will have already concluded. Thus, it is unlikely that R.P. Martinez and Herrera will be tried together.

applies whenever defense counsel "'owes conflicting duties to the defendant and some other third person.'" Attorney Conflict Motion at 4 (quoting <u>United States v. Soto-Hernandez</u>, 849 F.2d 1325, 1328 (10th Cir. 1988)). The United States acknowledges that "[t]he Sixth Amendment also guarantees a defendant the right to counsel of his own choice," but contends that this right is not absolute, because, "'[e]ven when a defendant seeks to proceed with conflicted counsel by waiving the conflict, a district court retains authority to reject the proffered waiver to preserve ethical standards and preserve a fair trial.'" Attorney Conflict Motion at 5-6 (quoting <u>United States v. Evanson</u>, 584 F.3d 904, 909 (10th Cir. 2009)).

       5.      The United States argues that Mr. Davis' prior representation of R.P. Martinez "may be adverse to Herrera's interests in the instant case," because, "[i]f Herrera goes to trial, Mr. Davis may be in a position where he would have to cross-examine his former client, and the scope of that cross-examination could include the murder in which Martinez pled guilty in 2002 while Mr Davis represented him." Attorney Conflict Motion at 6-7. It follows, according to the United States, that "Mr. Davis might not be able to uphold the duties of zealous advocacy and loyalty that he owes Herrera." Attorney Conflict Motion at 7. "Due process requires that a criminal defendant be represented by conflict-free counsel[,] . . . [so a] Defendant may not waive such an actual conflict, [and] new counsel would be necessary." Attorney Conflict Motion at 7.

       6.      The United States then notes that the United States District Court for the District of New Mexico applies the New Mexico Rules of Professional Conduct in its criminal proceedings. <u>See</u> Attorney Conflict Motion at 6. <u>See also</u> D.N.M. LR-Cr R. 57.2 ("In all criminal proceedings, attorneys will comply with the Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico, unless modified by local rule or Court order."). The United States argues that -- apart from any constitutional issues -- those ethical rules mean

that "Mr. Davis' representation of Defendant may not continue, even if Defendant were to consent." Attorney Conflict Motion at 7.

7.      The United States identifies three distinct ethical issues that prevent Mr. Davis from representing Herrera.  First, the United States contends that Mr. Davis cannot represent Herrera, because the New Mexico Rules of Professional Conduct state that attorneys "'should not represent a client whose interests are adverse to those of a present client, or whose interests are adverse to those of a former client on a matter that is the same or substantially related to the previous matter.'"  Attorney Conflict Motion at 8 (quoting In re Stein, 2008-NMSC-013, ¶ 22, 177 P.3d 513, 519).  See N.M. R. Prof'l Conduct 16-109(A)("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.").

8.      Second, the United States argues that Mr. Davis cannot represent Herrera, because the New Mexico Rules of Professional Conduct prevent lawyers from using information related to a prior representation "to the disadvantage of the former client except . . . when the information has become generally known; or . . . reveal[ing] information relating to the representation."  N.M. R. Prof'l Conduct 16-109(C).  See Attorney Conflict Motion at 8.  The United States

> does not pretend to know all of the information Mr. Davis has which relates to his representation of Martinez; however, neither Mr. Davis nor anyone else can say with any certainty that some aspect of such information is not, and will not later turn out to be, relevant to Herrera's case. Moreover, whether Mr. Davis has information relating to his representation of Martinez that is relevant in Herrera's case may well be later judged in hindsight by persons who will then know what Herrera and/or others will bring forth as relevant links between the cases.

Attorney Conflict Motion at 8-9.

9.      Third, the United States observes that the New Mexico Rules of Professional

Conduct provide that "'a lawyer shall not represent a client if the representation involves a concurrent conflict of interest,'" and that a concurrent conflict of interest exists when "'there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'" Attorney Conflict Motion at 9 (quoting N.M. R. Prof'l Conduct 16-107(A)). The United States asserts that Mr. Davis' duties to R.P. Martinez could limit Mr. Davis' representation of Herrera, because if R.P. Martinez testifies, then he

> would likely be cross-examined about his involvement as an SNM member. During his representation of Martinez, Mr. Davis dealt with that very issue. Mr. Davis would be prohibited from using that information to assist Herrera in his defense because Mr. Davis acquired that information in connection with his representation of Martinez.

Attorney Conflict Motion at 11 n.6. The United States elaborates that, "'[w]hen defense counsel has previously represented a government witness in a related case, the primary conflict-of-interest concern is that defense counsel may not be able to effectively cross-examine the witness for fear of divulging privileged information.'" Attorney Conflict Motion at 12 (quoting United States v. Bowie, 892 F.2d 1494, 1501 (10th Cir. 1990)).

10.     The United States asserts that those three ethical issues mean that, "[e]ven assuming that the conflict in this case is 'potential' in nature, the negative consequences which would arise if the conflict did develop are so significant that new counsel should be appointed," and that the "issue should be addressed now in order to avoid such a significant injury to the administration of justice in this case." Attorney Conflict Motion at 12. The United States adds, in the alternative, that rule 44 of the Federal Rules of Criminal Procedure indicates that "a hearing should be held to permit the district court to affirmatively participate in a defendant's waiver decision . . . to determine whether he knowingly and intelligently made the decision to continue with the conflicted counsel." Attorney Conflict Motion at 13. The United States also

notes that the Court has discretion regarding whether to accept Herrera's waiver, even if the Court finds that such a waiver is knowing and voluntary. See Attorney Conflict Motion at 14-15.

**2.      The Response.**

11.     Herrera filed his Response on May 25, 2017. See Defendant Carlos Herrera's Response to Government's Ex Parte Motion to [sic] Regarding Attorney Conflict [Doc. 1126] at 14, filed May 25, 2017 (Doc. 1164)("Response"). Herrera begins by noting that, "[s]ince representing Mr. Martinez, [Mr. Davis] has handled thousands of cases, including murder cases, destroyed Mr. Martinez's file years ago, and has no recollection of any contact, direct or indirect, with Mr. Martinez other than what is a matter of public record in reports and court filings." Response at 2. Herrera supports those assertions by attaching the Davis Aff. to his Response, and that affidavit states:

> 5.      Nearly seventeen (17) years ago, in 2000, while under contract with the New Mexico Public Defender Department, I was appointed to represent Defendant, Roy Martinez, on a State of New Mexico Murder charge related to the strangulation death of an inmate at the Bernalillo County Detention Center (BCDC).
> 6.      Although there were allegations that the murder was related to SNM, the existence of the SNM and Martinez' gang affiliation was never an essential part of the case, nor an element of the homicide charges.
> 7.      Martinez and others, were alleged to have strangled an inmate at BCDC in retaliation for some SNM information, the nature of which I do not recall.
>          . . .
> 10.     I destroyed my file many years ago and have no written records of my representation of Mr. Martinez.
> 11.     More importantly, I have absolutely no recollection of any communications I had with Mr. Martinez. In fact, all of the information I have placed in this affidavit regarding his case resulted from a public records search of Mr. Martinez' case. Consequently, I have no client confidences that would harm Mr. Martinez by my continued representation of Defendant Herrera.
> 12.     I have fully explained all of the above to my client Carlos Herrera, and he has no concerns regarding my prior representation of Mr. Martinez and subsequently waives any potential conflict.

Davis Aff. ¶¶ 5-12, at 2-3 (footnote omitted).

12.     In response to the United States' argument that the Court should hold a hearing under rule 44 of the Federal Rules of Criminal Procedure, Herrera argues that rule 44 does not apply.  <u>See</u> Response at 3.  Rule 44 does not apply, according to Herrera, because it addresses the propriety of joint representation -- <u>i.e.</u>, where one lawyer represents two defendants in the same proceeding -- whereas this case involves successive representation.  <u>See</u> Response at 3-4. Herrera acknowledges, however, that "the Court may proceed to consider this motion within its inherent authority."  Response at 4 (citing <u>Wheat v. United States</u>, 486 U.S. 153 (1988)).

13.     "The question then becomes, what ethical duties does counsel have in this situation regarding his current client, Mr. Herrera and his former client, Mr. Martinez." Response at 4.  Herrera asserts that Mr. Davis has two duties to R.P. Martinez as a former client: (i) Mr. Davis cannot represent "'a client whose . . . interests are adverse to [R.P. Martinez'] on a matter that is the same or substantially related to a previous matter,'" <u>see</u> Response at 4-5 (quoting N.M. R. Prof'l Conduct 16-109(A)); and (ii) Mr. Davis cannot "'use [or reveal] information relating to the representation to the disadvantage of [R.P. Martinez] except . . . when the information has become generally known,'" <u>see</u> Response at 5 (quoting N.M. R. Prof'l Conduct 16-109(C)).

14.     Herrera argues that neither of those duties prevent Mr. Davis from representing Herrera.  As to the first duty, Herrera contends that this case is not substantially related to Mr. Davis' earlier representation of R.P. Martinez.  <u>See</u> Response at 6.  Herrera states that two matters are substantially related "'if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.'"  Response at 6 (emphasis omitted)(quoting Committee Commentary to

N.M. R. Prof'l Conduct 16-109 cmt. 3). Herrera also observes that

> Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related.

Response at 6 (emphasis omitted)(quoting Committee Commentary to N.M. R. Prof'l Conduct 16-109 cmt. 3). Herrera concludes that, "[s]ince this case does not involve the homicide seventeen (17) years ago and [Mr. Davis] has no confidential information, the cases are <u>not</u> substantially related." Response at 7 (emphasis in original). As to Mr. Davis' second duty to R.P. Martinez, the duty not to use or reveal confidential information, Herrera contends that there is no danger that Mr. Davis will violate that duty, because Mr. Davis has no confidential information to use or reveal. <u>See</u> Response at 9 (citing Davis Aff. ¶ 11, at 3).

15. Herrera then addresses whether Mr. Davis' duties to R.P. Martinez will inhibit his representation of Herrera. <u>See</u> Response at 8. Herrera acknowledges that "an actual conflict exists if counsel is unable to effectively cross examine the government's witness, Mr. Martinez, because he previously represented him." Response at 8. Herrera asserts, however, that, "[s]hould Mr. Martinez testify, counsel intends to vigorously cross examine him concerning any adverse testimony related to Defendant Herrera. . . . None of his cross examination will be based on any confidences from his prior representation because he has no recollection of any confidential communications." Response at 9.

### 3. **The First Hearing.**

16. The Court held a hearing on November 8-9, 2017. <u>See</u> Nov. 8 Tr. at 1:9-11; Nov. 9 Tr. at 1:9-11. The Court decided that, although it had twenty-one motions on its docket, it would begin the hearing by addressing the Attorney Conflict Motion. <u>See</u> Nov. 8 Tr. at 8:2-4, 9:6-13 (Court). The Court articulated its understanding: (i) that "the Government wants Mr.

Davis off the case," Nov. 8 Tr. at 9:14-15 (Court); (ii) that "Mr. Martinez is not consenting to [Mr. Davis] staying on the case and waiving any conflict," Nov. 8 Tr. at 9:20-21 (Court); (iii) that "[i]t looks to me like it's an actual conflict" of interest, because "we're sitting right here in the same courtroom," and it "was always [Edward] Bennett Williams' Rule on Conflicts, [that] if you're in the same room, then it's probably an actual conflict," Nov. 8 Tr. at 9:21-10:2 (Court); and (iv) that it could accept a waiver of an actual conflict of interest, "[b]ut I'm not so certain I [can] cram [one] down . . . over an objection," Nov. 8 Tr. at 10:8-9 (Court). The Court then asked the United States to confirm that its "worst fear" regarding Mr. Davis is that he will "end up . . . cross-examining Mr. Martinez." Nov. 8 Tr. at 10:21-21 (Court). The United States indicated that its concern was, indeed, based on R.P. Martinez' anticipated testimony and Mr. Davis' cross-examination:

> I think that what's important is -- especially important in this case -- is the fact that he represented Mr. Martinez on an SNM murder.
>
> Mr. Martinez will be testifying in the trial that Mr. Herrera is set to be tried, the first group, the Javier Molina murder and the other conspiracy murders. He will be testifying in that case. He will be talking about the SNM. He will be talking about the racketeering activities, et cetera. And as part of that, he will be talking about murders that he committed. Specifically, he killed a person with the last name of Cavalier, at the Metropolitan Detention Center.

Nov. 8 Tr. at 11:10-23 (Armijo). The United States then clarified that Mr. Davis represented R.P. Martinez in the Cavalier murder, and that Mr. Davis' representation of R.P. Martinez in connection with that murder is "the one that's the true issue." Nov. 8 Tr. at 12:1-2 (Armijo). The United States elaborated:

> We based our [motion] upon the J & C in his Cavalier murder case. But I learned this morning that [Mr. Davis] represented Mr. Martinez on two murder cases. One of the murder cases he got off on because, I believe, shortly before trial, one of the witnesses was a former client of Mr. Davis'.
>
> Then he went on to represent him in the other murder case, which is the case that I was telling you about, which will be testified about. . . . .

Nov. 8 Tr. at 12:11-19 (Armijo). The United States elaborated further regarding R.P. Martinez' anticipated testimony:

> So we have Mr. Martinez testifying about this murder, talking about it with -- talking about other people involved, other SNM gang members. And he will also be testifying that Carlos Herrera is an SNM gang member that he knows. So those are things that he will be testifying about. I'm sure that the defense team, Herrera defense team, may question him about how he knows Carlos Herrera, how he knows he's a gang member. I'm sure they'll test that, you know, to the best of their ability cross-examine him on all of his testimony regarding the gang, the enterprise, the racketeering activities, about the previous murders that he committed, which Mike Davis was involved in two of them; one that he already got off on because of the conflict.

Nov. 8 Tr. at 13:1-16 (Armijo). The United States then informed the Court that "Mr. Martinez has told me through his attorney that he is not willing to waive the conflict. One of his concerns is that Mr. Davis knows how to push his buttons" in a way that "would impact him being cross-examined" by Mr. Davis. Nov. 8 Tr. at 14:19-22, 15:3-4 (Armijo).

17. The United States closed by preemptively addressing two arguments that it anticipated from Mr. Davis. First, the United States addressed the argument that Mr. Davis could avoid the conflict-of-interest issue by permitting co-counsel to cross-examine R.P. Martinez. See Nov. 8 Tr. at 13:17-21 (Armijo). According to the United States, another witness will testify regarding the murder underlying Mr. Davis' representation of R.P. Martinez, which raises the question whether Mr. Davis would need to avoid cross-examining that witness. See Nov. 8 Tr. at 13:22-14:7 (Armijo). The United States also observed that, in closing arguments, Mr. Davis will likely, "want[] to talk about the veracity of Mr. Martinez' testimony, then does that mean he isn't allowed to argue that." Nov. 8 Tr. at 14:4-7 (Armijo). Second, the United States responds to "[t]he fact that [Mr. Davis] indicates he doesn't really have an independent recollection of communications with Mr. Martinez," by raising the potential scenario where "in the middle of [R.P. Martinez'] testimony things start to resonate, he starts to remember." Tr.

14:8-12 (Armijo). The United States concluded by stating that those two issues cast doubt on whether "we can separate him and cure the problem." Nov. 8 Tr. at 14:16-18 (Armijo).

18.     Mr. Davis then came to the podium, and stated that "I like to think I have a close relationship with all of my clients," but "once 17 years passes, I have very little, if any, recollection, which is the case here." Nov. 8 Tr. at 15:15-19 (Davis). Mr. Davis argued that he does not have an actual conflict of interest, because he does not remember any confidential information regarding his representation of R.P. Martinez, and "[a]n actual conflict would be, is if I represented a witness in the case in another separate legal matter, and in the course of that legal matter that I would receive some confidences that somehow I could use to benefit Mr. Herrera." Nov. 8 Tr. at 16:13-17 (Davis). According to Mr. Davis, that R.P. Martinez' testimony might refresh his memory is, at most, a potential conflict of interest. See Nov. 8 Tr. at 16:23-24 (Davis). Mr. Davis added that, even "if the Court takes a different position," it could "obviate any concern of a conflict by simply allowing [his co-counsel] to conduct the cross-examination." Nov. 8 Tr. at 22:25-23:1 (Davis).

19.     The Court then invited R.P. Martinez' attorney in this case, Marcia Milner, to speak on the conflict-of-interest issues, but she declined. See Nov. 8 Tr. at 23:6-10 (Court, Milner). The Court indicated that it had a few questions for her anyhow. See Nov. 8 Tr. at 23:11-12 (Court). "Seriously, what do we mean here by Mr. Davis pushes [R.P. Martinez'] buttons?" Nov. 8 Tr. at 16-17. She responded:

> I guess, during the course of their relationship -- I mean, they were difficult cases, I'm sure that there were issues. But Mr. Martinez made it very clear to me, once he realized that Mr. Davis was on the case, that he had concerns that based on their relationship, Mr. Davis would know how to push his button, without disclosing what those actual issues were.

Nov. 8 Tr. at 23:18-25 (Milner).

20.     The Court gave "the final word on this" to the United States. Nov. 8 at Tr. 24:21-

22.  The United States took that opportunity to explain that this case is substantially related to

R.P. Martinez' earlier prosecution:

> We have to prove that there was an enterprise, in this case the SNM.  We have to prove our interstate commerce.  We have to prove racketeering activity, the murder, and the motive in the case.
>
> And I'm just going to give the Court an example of how -- why Mr. Davis' representation is important.  He says that, you know, it was just a murder case.  But in that case, as I indicated before, it was an SNM hit.  But if I am recalling -- there could be something that Mr. Martinez told Mr. Davis back during that representation.  For instance, he could have said: It isn't an SNM hit, it was a personal beef.  I just wanted to kill this guy.  So I'm taking the rap for anybody involved.  Nobody else was involved.  I'm pleading guilty.  And this was not gang related.
>
> And I don't know if that conversation took place.  But let's say for argument's purposes it did take place.  And now Mr. Martinez is taking the stand, now that he is cooperating, and he's going to say that this was an SNM hit, and he's going to name other people that committed the crime with him, that were co-conspirators.  And Mr. Davis then could say, you know what, he told me something different.  He told me that it wasn't an SNM hit.  And that's where the issue comes up.

Nov. 8 Tr. at 25:5-26:6 (Armijo).

21.     On the next day, Mr. Davis asked the Court to take up the conflict-of-interest

issue again.  <u>See</u> Nov. 9 Tr. at 48:17-19 (Davis).  The Court agreed.  <u>See</u> Nov. 9 Tr. at 49:5-6

(Court).  According to Mr. Davis, the Court should consider -- before disqualifying Mr. Davis --

three factors: (i) "the likelihood that the conflict will occur," Nov. 9 Tr. at 78:8-9 (Davis);

(ii) "the severity of the threat to counsel's effectiveness to Mr. Herrera," Nov. 9 Tr. at 78:25-79:1

(Davis); and (iii) "whether there are alternative measures available other than disqualifying" Mr.

Davis, Nov. 9 Tr. at 79:6-8 (Davis).  Mr. Davis argued that each of those factors militated against

disqualifying him.  <u>See</u> Nov. 9 Tr. at 78:8-79:16 (Davis).  Mr. Davis added that "there are some

serious consequences to my removal, Judge."   Nov. 9 Tr. at 79:17-18 (Davis).   Mr. Davis

explained:

> If you remove me from this, Ms. Bhalla is left alone on this case. And she was

brought in as second chair. She's not the lead counsel on this case. She was to assist in research, writing, assisting me in the trial work on the case.

And, frankly, I don't even know who is left on the CJA panel, if I'm removed from this case. I've taken a quick look at the conflicts panel, and it's pretty thin pickings.

The next thing is, if I am replaced, the new attorney is going to need time to get up to speed on a case that I've been working for a year-and-a-half. And, Judge, I'm not ready, and I still have things I have to do, and the trial is in two months. That sets up a motion for a continuance, or a motion for severance from the main group, because Mr. Herrera will not be prepared to go to trial. And forcing him to trial could lead to a claim of ineffective assistance of counsel.

Nov. 9 Tr. at 79:18-80:11 (Davis).

### 4.    <u>Supplemental Authority</u>.

22.    After the hearing, Herrera filed his Supplemental Authority in Support of Defendant's Response to Government's Motion Regarding Attorney Conflict [Doc. 1126], filed November 22, 2017 (Doc. 1469)("Supplement"). Herrera asserts that he is "prepared to state on the record that he waives any conceivable conflict and wishes to be represented by his attorney for last one and a half years, undersigned counsel." Supplement at 2. Herrera argues, however, that no conflict of interest exists. <u>See</u> Supplement at 3. "[T]he Government is unable to cite the Court to any instances of a conflict other than the mere fact that the current case involves the SNM and the prior representation of Martinez seventeen (17) years ago also involved the SNM." Supplement at 3. Herrera contends that Martinez, likewise, "cites to no instances of conflict other than to cavalierly state that undersigned counsel 'knows how to push his buttons.'" Supplement at 3. Herrera asserts that "the only connection with this case and the prior case is that both cases involve activities of the SNM," which is not enough to render them substantially related for the purposes of the New Mexico Rules of Professional Conduct, because "a mere resemblance of the two cases is not sufficient to establish a conflict." Supplement at 4-5.

23.    Herrera also argues that "[t]he Court clearly recognizes a presumption in favor of

Defendant's choice of counsel."  Supplement at 6 (citing <u>Wheat v. United States</u>, 486 U.S. at 153).  Herrera admits that Mr. Davis "is appointed and not retained," but he argues that "this is a distinction without a difference":

> Undersigned counsel has been working with the Defendant for over one and a half (1½) years.  They have met well over thirty-five (35) times during this period. Counsel has become close with Defendant and his close friends.  The attorney/client relationship is strong and undersigned counsel is Herrera's "preferred attorney".  If the Defendant chose to hire an attorney, he would hire undersigned counsel.  It is his counsel of choice, Michael Davis, that is the relevant inquiry.  Not the fact that he's court appointed.

Supplement at 6.  According to Herrera, the Court can respect Herrera's choice of counsel while simultaneously resolving any potential conflict by having Mr. Davis' co-counsel cross-examine R.P. Martinez.  <u>See</u> Supplement at 7.

## 5. **Notice Regarding Attorney Conflict.**

24.     On November 22, 2017, R.P. Martinez notified the Court that, as the Court has requested, Herrera's "[c]ounsel sent a copy of the [November 8-9 hearing] transcript to Mr. Martinez for his review and consideration of the additional arguments made by Carlos Herrera." Notice of Attorney Conflict ¶ 2, at 1, filed September 22, 2017 (Doc. 1471)("Notice").  "On November 21, 2017, counsel for Mr. Martinez reviewed the transcript by telephone with him." Notice ¶ 2, at 1.  After the telephone conference, R.P. Martinez "advised that he was still not willing to waive the actual attorney conflict."  Notice ¶ 3, at 1.

## 6. **The Second Hearing.**

25.     The Court held a second hearing on November 27-29, 2017.  <u>See</u> Second Hearing Tr. at 1:9-11.  As it began the hearing on November 27, 2017, the Court indicated that it was working on its opinion regarding the Attorney Conflict Motion and that "right now it's drafted as a grant for the motion to disqualify."  Second Hearing Tr. at 7:18-24 (Court).  Mr. Davis then asked whether "the Court considered the possibility of just disqualifying me from handling Mr.

Martinez, as opposed to removing me from the entire case as an alternative to disqualification?" Second Hearing Tr. at 8:12-16 (Davis). The Court answered that it considered that possibility, but "I'm not sure I can really sort that out and leave you in the case." Second Hearing Tr. at 8:17-20 (Court). In response to a second question from Mr. Davis, the Court indicated that Mr. Davis should stay in court and continue representing Herrera until it issued its written opinion. See Second Hearing Tr. at 8:24-9:7 (Davis, Court).

26.     In the afternoon of November 29, 2017, the Court asked the parties: "[W]hat is it you'd like me to be more precise, more accurate, more thoughtful, more detailed [about, or to] reconsider?" Second Hearing Tr. at 778:13-16 (Court). The Court then indicated that "I want either three from each side as a batting order, or if y'all can agree . . . give me your top three." Second Hearing Tr. at 778:11-16 (Court). The Court then addressed Mr. Davis:

> Mr. Davis I'll say it now, I don't get any joy out of the entering the order that I'm probably going to enter when I get back to Albuquerque. I respect you a lot and thank you for your hard work. And if I don't see you again good luck. You and I have done a lot of stuff over the years so I appreciate all your hard work.

Second Hearing Tr. at 778:17-23 (Court).

## LAW REGARDING ETHICAL DUTIES TO FORMER CLIENTS

27.     In criminal cases, the United States District Court for the District of New Mexico requires attorneys to "comply with the Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico." D.N.M. LR-Cr R. 57.2. Those rules state: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." N.M. R. Prof'l Conduct 16-109(A). "The scope of a 'matter' for the purposes of this rule depends on the facts of a particular situation or transaction." N.M. R. Prof'l Conduct 16-109

cmt. 2.  Whether a lawyer was involved in a particular matter "can also be a question of degree."

N.M. R. Prof'l Conduct 16-109 cmt. 2.  "The underlying question" when determining whether a

lawyer is disqualified because the lawyer represented a former client in the same matter "is

whether the lawyer was so involved in the matter that the subsequent representation can be justly

regarded as a changing of sides in the matter in question."  N.M. R. Prof'l Conduct 16-109 cmt.

2.

       28.     The New Mexico Rules of Professional Conduct define "substantially related"

matters:

> Matters are "substantially related" for purposes of this rule if they involve the
> same transaction or legal dispute or if there otherwise is a substantial risk that
> confidential factual information as would normally have been obtained in the
> prior representation would materially advance the client's position in the
> subsequent matter. . . . .  Information that has been disclosed to the public or to
> other parties adverse to the former client ordinarily will not be disqualifying.
> Information acquired in a prior representation may have been rendered obsolete
> by the passage of time, a circumstance that may be relevant in determining
> whether two representations are substantially related. . . .  A former client is not
> required to reveal the confidential information learned by the lawyer in order to
> establish a substantial risk that the lawyer has confidential information to use in
> the subsequent matter. A conclusion about the possession of such information
> may be based on the nature of the services the lawyer provided the former client
> and information that would in ordinary practice be learned by a lawyer providing
> such services.

N.M. R. Prof'l Conduct 16-109 cmt. 3.  Phrased alternatively, "[a] substantial relationship exists

'if the factual contexts of the two representations are similar or related.'"  Cole v. Ruidoso Mun.

Schs., 43 F.3d 1373, 1384 (10th Cir. 1994)(quoting Smith v. Whatcott, 757 F.2d 1098 1100

(10th Cir. 1985)).  "An objective standard is used when determining whether the lawyer

reasonably could believe that the representation of a client with interests adverse to those of

another client would not adversely affect the lawyer's relationship with the other client."  In re

Stein, 2008-NMSC-013, ¶ 22, 177 P.3d at 519.  Even when a former client's representation is not

substantially related to "the subject matter of [a current client's] trial," the two representations

can still be substantially related when the current client's "defense would necessarily involve refuting [the former client's] testimony." Pickney v. United States, 851 A.2d 479, 487-88 (D.C. Ct. App. 2004).

29. In addition to restricting a lawyer's ability to participate in certain matters connected to their representation of a former client, the New Mexico Rules of Professional Conduct state:

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> > (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
> >
> > (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

N.M. R. Prof'l Conduct 16-109(C). "The New Mexico Supreme Court has disbarred attorneys pursuant to this rule where, in part, an attorney's use of information related to his prior representation of a client involved defrauding that client out of more than $100,000.00 in the course of representation regarding a will and testament." Abila v. Funk, 2016 WL 5376323, at *6 (D.N.M. Sept. 20, 2016)(Browning, J.)(citing In re C'de Baca, 1989-NMSC-070, ¶¶ 1-7, 782 P.2d 1348).

## LAW REGARDING THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA AND ATTORNEY CONFLICTS

30. The Sixth Amendment grants criminal defendants the right to the effective assistance of counsel. One aspect of the effective assistance of counsel is the absence of conflicts of interest. The Sixth Amendment also grants defendants the right to counsel of their choice. When the right to conflict-free counsel is in tension with the right to counsel of one's choice, a defendant may knowingly and voluntarily waive the former to effectuate the latter. A

court, however, has discretion to reject such a waiver.

1. **The Right to Conflict-of-Interest-Free Counsel.**

31. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. vi. Furthermore,

> [t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command . . . . An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

Strickland v. Washington, 466 U.S. 668, 685 (1984). "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." Strickland v. Washington, 466 U.S. at 688. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). A violation of applicable ethical rules, however, does not necessarily amount to an actual conflict. See United States v. Gallegos, 39 F.3d 276, 279 (10th Cir. 1994)("[I]t is apparent also that a violation of the rules [of professional conduct] will not in itself constitute a constitutional violation under *Cuyler* and related cases."). Instead, "[a]n actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." United States v. Bolivar, No. CIV 12-0128, 2012 WL 3150430, at *11 (D.N.M. July 20, 2012)(Browning, J.)(quoting Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000)). When an actual conflict of interest significantly impacts defense counsel's performance, reversal is automatic; no further showing of prejudice is required. See Strickland v. Washington, 466 U.S. at 692.

32.     Reversal is also automatic when a defendant objects to multiple representation --
i.e., one lawyer representing multiple defendants in a single proceeding -- and a trial judge
neither acts to remove the potential conflict of interest by appointing separate counsel nor
"take[s] adequate steps to ascertain whether the risk [is] too remote to warrant separate counsel."
Holloway v. Arkansas, 435 U.S. 475, 484 (1978).  See Mickens v. Taylor, 535 U.S. 162, 168
(2002)(Scalia, J.)("*Holloway* thus creates an automatic reversal rule only where defense counsel
is forced to represent codefendants over his timely objection, unless the trial court has
determined that there is no conflict.").  See also United States v. Perez, 325 F.3d 115, 125 (2d
Cir. 2003)("[A]n attorney has a potential conflict of interest if 'the interests of the defendant may
place the attorney under inconsistent duties at some time in the future.'" (quoting United States
v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998))).

33.     Although "a possible conflict inheres in almost every instance of multiple
representation," a trial court has an "affirmative duty to inquire into the propriety of multiple
representation" only when it "knows or reasonably should know that a particular conflict exists."
Cuyler v. Sullivan, 446 U.S. 335, 346-48 (1980).  See United States v. Rogers, 209 F.3d 139,
143 (2d Cir. 2000)("[A] court that learns of a possible conflict must investigate the facts and
details of the attorney's interests to determine whether the attorney in fact suffers from an actual
conflict, a potential conflict, or no genuine conflict at all."(internal citations omitted)).  If a trial
court fails to undertake that inquiry, however, reversal is not automatic.  See Mickens v. Taylor,
535 U.S. at 173-74 ("[S]ince the trial court's failure to make the *Sullivan*-mandated inquiry does
not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for
petitioner to establish that the conflict of interest adversely affected his counsel'

34.     s performance.").  When the government is aware of a conflict of interest, it "has

a duty to bring it to the court's attention and, if warranted, move for disqualification." United States v. Migliaccio, 34 F.3d 1517, 1528 (10th Cir. 1994). Defense counsel has a similar duty. See Cuyler v. Sullivan, 446 U.S. at 346 ("Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.").

35.     "These principles concerning conflicts of interest are not restricted to cases of joint representation of co-defendants at a single trial." United States v. Winkle, 722 F.2d 605, 610 (10th Cir. 1983). "[I]n a case of joint representation of conflicting interests the evil -- it bears repeating -- is in what the advocate finds himself compelled to *refrain* from doing," Holloway v. Arkansas, 435 U.S. at 490 (emphasis in the original), and that same evil "is a potential problem in cases where a defendant's attorney previously represented a Government witness," United States v. Winkle, 722 F.2d at 610. Accordingly, the United States Court of Appeals for the Tenth Circuit was "persuaded by the views expressed in *Ross v. Heyne*, 638 F.2d 979, 983 (7th Cir. 1980), that an actual conflict would arise where defense counsel is unable to cross-examine a Government witness effectively because the attorney also represented the witness." United States v. Winkle, 722 F.2d at 610. See Ross v. Heyne, 638 F.2d 979, 983 (7th Cir. 1980)("An actual conflict would arise where defense counsel is unable to cross-examine a prosecution witness effectively because the attorney also represented the witness."); id. ("The problem that arises . . . is that the attorney may have privileged information obtained from the witness that is relevant to cross-examination, but which he refuses to use for fear of breaching his ethical obligation to maintain the confidences of his client."). The Tenth Circuit, accordingly, concluded that it "should apply the conflicts principles from the cases of multiple representation of defendants here where the defense counsel in this criminal trial had represented

the principal Government witness in litigation with a factual relationship to some issues in this criminal case," such that, "if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of the defendant's representation, then defendant need not demonstrate prejudice to obtain relief." United States v. Winkle, 722 F.2d at 610.

36. There is not, however, a "per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness in a related case." United States v. Bowie, 892 F.2d 1494, 1502 (10th Cir. 1990). Instead, a court must determine "whether an actual conflict adversely affected defense counsel's performance -- that is, a conflict existed that might have foreclosed a specific and seemingly valid or genuine strategy or tactic in the handling of th[e] witness." United States v. Bowie, 892 F.2d at 1502. Additionally, a court does not need to make that determination if "the *witness* waived any attorney-client privilege that might have restricted defense counsel's cross-examination" or if the "*defendant* had knowledge of his counsel's prior representation of the government witness and waived his right to counsel free of such conflicts." United States v. Bowie, 892 F.2d at 1502 (emphasis in original). See Church v. Sullivan, 942 F.2d 1501, 1512 (10th Cir. 1991)("On remand, the district court should determine whether either of two waivers occurred because if Green 'waive[d] his attorney-client privilege, then any potential conflict is removed[,]' and further, Church may have 'waived his right to counsel free of such conflicts.'" (alterations in original)(quoting United States v. Bowie, 892 F.2d at 1502)). It is worth noting, however, that, while a defendant's waiver suffices, even without a witness' waiver, with respect to the Sixth Amendment's effective-assistance-of-counsel guarantee, a violation of professional ethical rules can still occur. See United States v. Gallegos, 39 F.3d at 279 (considering the application of ethical rules to an ineffective-assistance-of-counsel claim and stating that "[i]t is apparent that some elements therein bear on the

constitutional issue," but concluding that "it is apparent also that a violation of the rules will not in itself constitute a constitutional violation under *Cuyler* and related cases").

37. The Court of Appeals of the District of Columbia has laid out a trial court's analysis when determining whether "a potential conflict reaches the point at which disqualification is warranted" in the context of successive representation:

> [T]he trial court should "examine whether the subject matter of the first representation is substantially related to that of the second," whether "the conflict could cause the defense attorney improperly to use privileged communications in cross-examination," and whether "the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client.

Pinkney v. United States, 851 A.2d at 487 (quoting United States v. Ross, 33 F.3d 1507, 1523 (11th Cir. 1994)). See United States v. Roach, 912 F. Supp. 2d 1153, 1172-73 (D.N.M. 2012)(Browning, J.)(applying Pinkney v. United States). "When a district court finds that counsel has a conflict of interest, real or potential, it retains substantial latitude to disqualify counsel." United States v. McKeighan, 685 F.3d at 968 (quoting United States v. Collins, 920 F.2d at 627). The Seventh Circuit has held that, before disqualifying counsel based on a potential conflict, the district court should "evaluate (1) the likelihood the conflict will actually occur; (2) the severity of the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification." United States v. Turner, 594 F.3d 946, 952 (7th Cir. 2010). A district court's ruling regarding a defendant's right to counsel is reviewed on appeal for abuse of discretion. See United States v. McKeighan, 685 F.3d at 968. See also Wheat v. United States, 486 U.S. at 164 ("The evaluation of the facts and circumstances regarding a defendant's right to counsel must be left primarily to the informed judgment of the trial court.").

## 2. **The Right to Counsel of One's Choice.**

38.     The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant." Wheat v. United States, 486 U.S. at 159. Part of that guarantee is the defendant's right to representation by the counsel of their choice. See United States v. McKeighan, 685 F.3d 956, 966 (10th Cir. 2012)(stating that the Sixth Amendment "guarantee includes the 'right to be represented by an otherwise qualified attorney **whom the defendant can afford to hire**, or who is willing to represent the defendant'" (emphasis added)(quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989))). See also United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006)(Scalia, J.)("[A]n element of [the Sixth Amendment] right is the right of a defendant **who does not require appointed counsel** to choose who will represent him." (emphasis added)). Wrongly depriving a defendant of chosen counsel's representation, which requires reversal no matter whether the error prejudiced the defendant. See United States v. McKeighan, 685 F.3d at 966 (quoting United States v. Gonzalez-Lopez, 548 U.S. at 146-50).

39.     The Supreme Court of the United States of America's precedent indicates that indigent defendants are unable to choose their counsel. See Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624 ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel."). See also Luis v. United States, 136 S. Ct. 1083, 1089 (2016)(Breyer, J.)(plurality opinion)("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."); United States v. Gonzalez-Lopez, 547 U.S. at 144 ("We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."). Consequently, indigent criminal

defendants "have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624. That conclusion has received significant academic criticism. See, e.g., Janet Moore, The Antidemocratic Sixth Amendment, 91 WASH. L. REV. 1705, 1707 (2016)("On hearing that indigent defendants have no right to choose their lawyers, the Chief Justice [John Roberts] asked, 'Why not?' The correct answer is that there is no good reason to discriminate against poor people in the vindication of this fundamental constitutional right." (quoting United States v. Gonzalez-Lopez, Transcript of Oral Argument at 34, 548 U.S. 140 (2006)(No. 05-352))); Stephen J. Schulhofer & David D. Friedman, Rethinking Indigent Defense: Promoting Effective Representation Through Consumer Sovereignty and Freedom of Choice for All Criminal Defendants, 31 AM. CRIM. L. REV. 73, 109–10 (1993); Peter W. Tague, An Indigent's Right to the Attorney of his Choice, 27 STAN. L. REV. 73 (1974).

40.     The Supreme Court has not articulated a rationale for why indigent defendants have no right to choose their attorney, but it apparently stems from a concern for attorney autonomy: "[A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." Wheat v. United States, 486 U.S. at 159. One might also worry that allowing indigent defendants to choose their attorney would threaten the public purse by forcing the government to pay for top tier representation, e.g., Johnnie Cochran, in every case. See Luis v. United States, 136 S. Ct. at 1089 ("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."). When he was a judge on the United States Court of Appeals for the Seventh Circuit, Professor Richard Posner articulated an explanation sounding in law and economics: "The services of the criminal defense bar cannot be auctioned to the highest

bidder among the indigent accused-by definition, indigents are not bidders. But these services must be allocated somehow; indigent defendants cannot be allowed to paralyze the system by all flocking to one lawyer." United States v. Ely, 719 F.2d 902, 905 (7th Cir. 1983).

41.     Attorney autonomy, funding constraints, and resource-allocation concerns fail to explain, however, why indigent criminal defendants should not be able to choose -- subject to the same constraints that apply to non-indigent defendants, i.e., a trial judge's ability to "deem a chosen lawyer to be unqualified to handle the case, unavailable to proceed in a timely manner without disrupting the court's docket, or unable to cure a conflict of interest," Moore, supra 91 WASH. L. REV. at 1710-11 -- their counsel from among those attorneys willing to take their case at the generally applicable rates for appointed counsel under the Criminal Justice Act, 18 U.S.C. § 3006A(d), or analogous state legislation.   The Court is reluctant to say that the Sixth amendment requires the government to give indigent defendants that right, but, as a matter of public policy, such a right would not threaten attorney autonomy, because an indigent criminal defendant could select only a lawyer willing to take the case.   Nor would such a right threaten the public purse, because a defendant-chosen lawyer would be compensated at the same rate -- and with the same total-expense constraints, see 18 U.S.C. § 3006A(d)(2) -- as a government-appointed lawyer.   Defense lawyers' willingness to take particular cases, or the lack thereof, and the "mundane case-management considerations" that restrict any criminal defendant's "right to be represented by counsel of choice" would address resource-allocation concerns:

> If a trial judge schedules a trial to begin on a particular date and defendant's counsel of choice is already committed for other trials until some time thereafter, the trial judge has discretion under appropriate circumstances to refuse to postpone the trial date and thereby, in effect, to force the defendant to forgo counsel of choice.

United States v. Gonzalez-Lopez, 548 U.S. at 155.

42.     The Supreme Court has, in fact, recognized that indigent criminal defendants have

- 35 -

a limited right to determine who represents them in narrow circumstances where such a right does not threaten the ability of lawyers to choose their clients. An indigent criminal defendant has the right to be represented by an attorney who is willing to take the case pro bono and not by a court-appointed attorney. See United States v. Gonzalez-Lopez, 548 U.S. at 144 ("'[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney . . . who is willing to represent the defendant even though he is without funds.'" (quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624-25)). Likewise, indigent defendants are entitled to refuse the assistance of appointed counsel and, instead, to represent themselves. See Faretta v. California, 422 U.S. 806, 807 (1975)(Stewart, J.).

**3.     Waiver of Conflicts of Interest.**

43.     It is possible for a criminal defendant to waive their right, under the Sixth Amendment, to conflict-free counsel. See Mickens v. Taylor, 535 U.S. at 173 ("In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney."). See also Peretz v. United States, 501 U.S. 923, 936 (1991)("The most basic rights of criminal defendants are . . . subject to waiver."); United States v. Hunt, 62 F. App'x 272, 276 (10th Cir. 2003)(unpublished)[3]("Nevertheless, a defendant may knowingly and intelligently waive the right

---

[3]United States v. Hunt is an unpublished order and judgment, but the Court can rely on it to the extent its reasoned analysis is persuasive in the present case. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").

In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).

to conflict-free counsel."). To effect a valid waiver, a trial court should "affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel." United States v. Winkle, 722 F.2d at 611 (citations omitted). A district court "should also determine whether the defendant understands the facts underlying the conflict and the dangers and risks associated with waiving the conflict." United States v. Hunt, 62 F. App'x at 276 (citing Eden v. Hannigan, 87 F.3d 1109, 1118 (10th Cir. 1996)). Where a colloquy does not reflect that the defendant understood those risks and knowingly and intelligently waived the conflict, the Tenth Circuit has held that there is a Sixth Amendment violation where the conflict adversely affected counsel's performance. See Eden v. Hannigan, 87 F.3d at 1112, 1118.

44. A court can, however, "decline a proffer of waiver, and insist that defendants be separately represented." United States v. Wheat, 486 U.S. at 162. Courts can refuse proffered waivers "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Wheat v. United States, 486 U.S. at 163. The Supreme Court explained that,

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

Wheat v. United States, 486 U.S. at 159. Accordingly, a defendant's "right to choose their own counsel is circumscribed in several important respects." Wheat v. United States, 486 U.S. at 159. One such limitation on a defendant's right to counsel of their choice is a federal court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of

the profession and that legal proceedings appear fair to all who observe them." <u>Wheat v. United States</u>, 486 U.S. at 160. <u>See</u> <u>United States v. McKeighan</u>, 685 F.3d at 968 ("Courts have the duty to 'balance a defendant's constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice.'" (quoting <u>United States v. Collins</u>, 920 F.2d 619, 626 (10th Cir. 1990))). Permitting defendants to proceed with conflicted counsel "'is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court.'" <u>United States v. Wheat</u>, 486 U.S. at 162 (quoting <u>United States v. Dolan</u>, 570 F.2d 1177, 1184 (3d Cir. 1978)).

## ANALYSIS

45. The Court determines that Mr. Davis' representation of Herrera in this case involves the same legal dispute as Mr. Davis' earlier representation of R.P. Martinez. Accordingly, the New Mexico Rules of Professional Conduct prevent Mr. Davis from representing Herrera in this case without R.P. Martinez' consent. R.P. Martinez does not consent, so the Court will disqualify Mr. Davis and appoint substitute counsel to represent Herrera.

## I. MR. DAVIS' ETHICAL DUTIES TO R.P. MARTINEZ, HIS FORMER CLIENT, PREVENT HIM FROM REPRESENTING HERRERA IN THIS CASE.

46. The United States District Court for the District of New Mexico requires attorneys representing criminal defendants to "comply with the Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico." D.N.M. LR-Cr R. 57.2. Those rules impose two distinct duties vis-à-vis an attorney's former clients. The first is a duty of confidentiality. Attorneys cannot "use information relating to the representation" of a former client to their

disadvantage, unless "the information has become generally known." N.M. R. Prof'l Conduct 16-109(C)(1). Likewise, an attorney cannot "reveal information relating to the representation." N.M. R. Prof'l Conduct 16-109(C)(2). The second is a duty to refrain from representing someone whose "interests are materially adverse to the interests of [a] former client." N.M. R. Prof'l Conduct 16-109(A).

47. That second duty applies, however, only to the matters in which an attorney represented a former client and to "substantially related" matters. N.M. R. Prof'l Conduct 16-109(A). A particular matter's scope -- and, hence, whether it is the same matter in which an attorney represented a former client -- "depends on the facts of a particular situation or transaction," but "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." N.M. R. Prof'l Conduct 16-109 cmt. 2. A matter is substantially related to a matter in which an attorney represented a former client "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." N.M. R. Prof'l Conduct 16-109 cmt. 3 (emphasis added). "Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related." N.M. R. Prof'l Conduct 16-109 cmt. 3.

48. Herrera's present prosecution is substantially related to Mr. Davis' earlier representation of R.P. Martinez, because it involves the same legal dispute. Herrera is charged with two violations of 18 U.S.C. § 1959 ("VICAR"). See Superseding Indictment at 20-21. To determine whether Mr. Davis' earlier representation of R.P. Martinez is substantially related to

Herrera's prosecution under VICAR, it is important to understand what the United States must prove to obtain a VICAR conviction. A VICAR violation requires an underlying state-law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a). The underlying state-law offense becomes a federal VICAR violation only when it is committed: (i) "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity"; or (ii) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). For VICAR purposes, an enterprise is a legal entity, or a "union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b). Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that is a state-law felony, 18 U.S.C. § 1961(1)(A), and "any act which is indictable under any" one of myriad federal statutes, § 1961(1)(B)-(G). The United States must, thus, go beyond proving that Herrera conspired to murder J.M. and murdered J.M. See Superseding Indictment at 20-21. To obtain a VICAR conviction the United States must show that the SNM exists, that it is a "group of individuals associated in fact," that it engages in interstate commerce or that its activities affect interstate commerce, 18 U.S.C. § 1959(b)(2), and that it is engaged in racketeering activity, see 18 U.S.C. § 1959(a), such as murder, extortion, and dealing drugs, see 18 U.S.C. § 1961(1)(A).

49.     To satisfy that burden, the United States will elicit testimony from R.P. Martinez

that supports the essential elements that it must prove: (i) that the SNM exists as an enterprise, specifically a "group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce," 18 U.S.C. § 1959(b)(2); (ii) that the SNM has a structure, hierarchy, and certain other customs; and (iii) that the SNM engages in racketeering activity, see Nov. 8 Tr. at 11:18-23 (Armijo)("He will be talking about the SNM. He will be talking about the racketeering activities, et cetera."). See also Nov. 8 Tr. at 25:4-9 (Armijo)("We have to prove that there was an enterprise, in this case the SNM. We have to prove our interstate commerce. We have to prove racketeering activity, the murder, and the motive in the case."). The United States will try to elicit testimony from R.P. Martinez regarding the murder for which Mr. Davis represented R.P. Martinez, and R.P. Martinez will probably testify that the murder was gang-motivated and not the result of a personal grievance with the victim, which makes the murder relevant to the SNM's goals and operations. The United States plans to call another witness -- Gerald Archuleta -- to testify regarding the same murder. See Nov. 8 Tr. at 13:22-14:3 (Armijo). Testimony regarding that murder is probative regarding both of the existence of the SNM as an enterprise and of the SNM's engagement in racketeering activities.

50. Herrera, does not, however, want the United States to establish any of VICAR's elements, including the SNM's existence and its engagement in racketeering activity. Consequently, R.P. Martinez' impeachment will be an important part of Herrera's defense, which renders R.P. Martinez' earlier case, in which Mr. Davis represented R.P. Martinez, substantially related to this case. See Pickney v. United States, 851 A.2d at 488 ("[B]ecause impeachment of Mr. Henderson [a former client] would be an important part of the defense, issues concerning Henderson's credibility were therefore 'substantially related' to Mr. Wood's

representation of appellant [a current client].").  But see id. at 488 n.9 ("On the other hand, we cannot say that a refusal to disqualify Mr. Wood would have been an abuse of discretion, given the closeness of this case.").

51.     Herrera's "interests are materially adverse to the interests of" R.P. Martinez. N.M. R. Prof'l Conduct 16-109(A).  R.P. Martinez has accepted a plea bargain from the United States and is going to testify against Herrera.  See Attorney Conflict Motion at 2.  As stated above, Herrera will likely seek to discredit or otherwise undermine R.P. Martinez' testimony, including his testimony regarding the state case in which Mr. Davis represented R.P. Martinez. See United States v. Roach, 912 F. Supp. 2d 1153, 1173 (D.N.M. 2012)(Browning, J.)(stating that two codefendants' interests would become adverse if one of them accepted "a plea deal requiring their testimony").  Herrera would prefer R.P. Martinez not to testify, and "[s]hould Mr. Martinez testify, counsel intends to vigorously cross examine him concerning any adverse testimony related to Defendant Herrera."  Attorney Conflict Motion at 8.

52.     Rule 16-109(A), thus, prohibits Mr. Davis' representation of Herrera unless R.P. Martinez "gives informed consent, confirmed in writing."  N.M. R. Prof'l Conduct 16-109(A). R.P. Martinez will not give such consent.  See Nov. 8 Tr. at 24:2-3 (Milner); Notice ¶ 3, at 1. Consequently, Mr. Davis cannot represent Herrera no matter whether Mr. Davis remembers any confidential information regarding his representation of R.P. Martinez.  Risks regarding confidential information can show that two matters are substantially related, but a confidential information analysis is not necessary here, because the Court's analysis of VICAR issues shows that Herrera's VICAR prosecution "involve[s] the same transaction or legal dispute" as R.P. Martinez' state-court prosecution.  N.M. R. Prof'l Conduct 16-109 cmt. 3.  Moreover, even if a confidential information analysis were necessary, the Court would reach the same result.  Two

matters are substantially related if there "is a substantial risk that confidential factual information **as would normally have been obtained** in the prior representation would materially advance the client's position in the subsequent matter." N.M. R. Prof'l Conduct 16-109 cmt. 3 (emphasis added). That inquiry focuses applies an objective standard for determining whether two matters are substantially related, so Mr. Davis' subjective ignorance is irrelevant. See In re Stein, 2008-NMSC-013, ¶ 22, 177 P.3d at 519 (applying "[a]n objective standard" to determine whether an attorney violated rule 16-109(A)). That rule is sensible, because former clients, like R.P. Martinez, may have better recollections than their former lawyers regarding the confidential information revealed as part of the former representation, and they may have legitimate concerns that a presently ignorant attorney's recollection will be refreshed at a later date. Further, former clients should not be forced to accept representations that their former attorneys are presently aware of no confidential information.

53. Mr. Davis' ignorance and Herrera's willingness to have Mr. Davis' co-counsel, Ms. Bhalla, cross-examine R.P. Martinez, see Supplement at 7,[4] are relevant to whether Mr.

---

[4]Herrera undermines his proffer to have Ms. Bhalla cross-examine R.P. Martinez in Defendant Carlos Herrera's Motion to Appoint Lead Counsel and Continue January 29, 2018, Trial Setting and Related Scheduling Order, filed November 28, 2017 (Doc. 1488)("Motion to Appoint"). In his Motion to Appoint, Herrera states that Mr. Davis "requested that undersigned Attorney Carey Bhalla be appointed as second-counsel in this matter, mainly to assist with research and writing issues and to assist at trial." Motion to Appoint at 1-2. According to Herrera, "Attorney Bhalla has been working on research and writing issues while Attorney Davis was keeping abreast of the discovery and confidential informant issues," and "Attorney Bhalla was recently appointed to the CJA felony panel and does not currently serve on the complex panel." Motion to Appoint at 2. Herrera indicates that Ms. Bhalla has not tried a federal criminal case. See Motion to Appoint at 2. Herrera contends that Ms. Bhalla's inexperience is so debilitating that, "[w]ithout the assistance of co-counsel in a case this complex, [she] cannot provide constitutionally effective assistance." Motion to Appoint at 3. Compare Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985)(acknowledging that whether a defense attorney "used drugs during Berry's trial was far from settled" but recognizing that "under *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim" (emphasis in original)).

Davis will use or reveal R.P. Martinez' confidential information, see N.M. R. Prof'l Conduct 16-109(C), but they are not relevant to whether Mr. Davis can represent Herrera without violating rule 16-109(A), because lawyers have distinct "continuing duties to former clients with respect to confidentiality **and** conflicts of interest," N.M. R. Prof'l Conduct 16-109 cmt. 1 (emphasis added). Herrera's desire to continue to have Mr. Davis represent him is, likewise, immaterial to whether Mr. Davis can continue to represent him, because no defendant, indigent or otherwise, can, under current constitutional law, "insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government." Wheat v. United States, 486 U.S. at 159. See Morris v. Slappy, 461 U.S. 1, 25 (1983)(Brennan, J., concurring)(decrying the majority's failure to recognize an indigent "defendant's interest in preserving his relationship with a particular attorney"). Accordingly, the Court will disqualify Mr. Davis.

**IT IS ORDERED** that the request, in the United States' Sealed Motion Regarding Attorney Conflict, filed May, 4, 2017 (Doc. 1126), to disqualify Michael V. Davis as attorney of record for Defendant Carlos Herrera is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James D. Tierney
    Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
    Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff United States*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russel Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorneys for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, LLC
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico


*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

    *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

    *Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

    *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

    *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

    *Attorneys for Defendant Mario Rodriguez*

Jacqueline K. Walsh
Walsh & Larranaga
Seattle, Washington

--and

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

*Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

*Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

*Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm, LLC
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Christopher Garcia*

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

--and--

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Santos Gonzalez*

Angela Arellanes
Albuquerque, New Mexico

     *Attorneys for Defendant Shauna Gutierrez*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Brandy Rodriguez*